**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| **IAN DUFFY, SAMUEL LEE and** | § | |
| **DOUGLAS BOYLE,** on behalf of | § | |
| themselves and all others similarly situated, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| **v.** | § | **Case No.  2:24-cv-209** |
| | § | |
| **IAN MACALINAO and DYLAN** | § | **CLASS ACTION COMPLAINT FOR** |
| **MACALINAO,** | § | **DAMAGES AND DEMAND FOR** |
| | § | **JURY TRIAL** |
| *Defendants*. | § | |

**PLAINTIFFS' ORIGINAL CLASS ACTION COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

COME NOW, Plaintiffs, Ian Duffy, Samuel Lee and Douglas Boyle (together, "Plaintiffs"), for themselves and all others similarly situated (hereinafter, Plaintiffs and the putative class members are collectively referred to as the "Class" or "Class Members"), and for their claims and causes of action against Defendants, Ian Macalinao and Dylan Macalinao (together, "Defendants"), allege and state as follows:

1.      Plaintiffs are individuals who invested—and ultimately lost—their personal savings as a result of Defendants' wrongful conduct. Although these investments involved sometimes complex cryptocurrency issues, this case is simple and straight-forward. Plaintiffs' investments were made in a cryptocurrency platform, named "Cashio," developed and maintained by Defendants. Defendants convinced Plaintiffs to invest in Defendants' Cashio cryptocurrency platform through numerous representations touting the safety and security of the platform.

2.      However, from the beginning, Defendants' cryptocurrency platform and the assurances provided to potential investors were based on a stack of fake identities, knowingly false

statements, material omissions and the perpetration of their unlawful scheme. Ultimately, these fake identities, false statements and material omissions would be exposed, and Plaintiffs would suffer substantial losses.

3.      Defendants have admitted much of the wrongful conduct that caused Plaintiffs' losses. Defendants admitted they created a series of fake identities to promote this platform, and admitted they made false statements about the security of the platform. After a hack of the platform resulting in Plaintiffs' substantial losses, Defendants admitted their liability in an unpublished blog post. This case is simple and straight-forward.

## **PARTIES**

4.      The allegations set forth above are re-alleged and incorporated herein.

5.      Plaintiffs are individual victims of Defendants' unlawful and fraudulent scheme. Specifically, through knowingly false representations and the perpetration of their unlawful scheme, Defendants misled Plaintiffs into investing in Defendants' supposedly safe and secure Cashio cryptocurrency platform, as further alleged below. As a result of their reliance on Defendants' deceptive representations and conduct, each Plaintiff suffered significant financial losses and other compensable harms.

6.      Plaintiff, Ian Duffy, is an individual citizen of the State of Texas and resident of Dallas County, Texas.

7.      Plaintiff, Samuel Lee, is an individual citizen of the State of Texas and resident of Travis County, Texas.

8.      Plaintiff, Douglas Boyle, is an individual citizen of the State of Virginia and resident of Richmond City, Virginia.

9.      Defendants are two brothers, who reside within this District. In concert with one another, Defendants knowingly designed and perpetrated the unlawful and fraudulent scheme that wrongfully deceived and victimized Plaintiffs and the Class.

10.     Defendant, Ian Macalinao, is an individual citizen of the State of Texas and resident of Denton County, Texas. Ian Macalinao may be served with process by delivering a copy of the Summons and this Complaint to his personal residence and principal homestead, which is located within this District at 811 Mountain Laurel Dr., Prosper, Texas 75078.

11.     Defendant, Dylan Macalinao, also is an individual citizen of the State of Texas and resident of Denton County, Texas. Dylan Macalinao may be served with process by delivering a copy of the Summons and this Complaint to his personal residence and principal homestead, which is located within this District at 821 Mountain Laurel Dr., Prosper, Texas 75078.

## JURISDICTION AND VENUE

12.     The allegations set forth above are re-alleged and incorporated herein.

13.     This Court has both general and specific personal jurisdiction over each Defendant. Each Defendant is an individual citizen and resident of the State of Texas. Each Defendant maintains their principal homestead and residence in this State. And, each Defendant continuously and systematically engaged and engages in business from and within this State. Thus, each Defendant literally is "at home" in the State of Texas. Moreover, each Defendant perpetrated and executed the fraudulent scheme detailed herein, and committed other tortious acts and omissions, in this State, and this action arises out of and relates to that conduct. By residing in, conducting business in, committing unlawful activities in, and purposefully directing their tortious conduct and other activities at the State of Texas and its citizens, each Defendant purposefully availed itself of the privilege of conducting business within this State and invoking the benefits and protections

3

of this State's laws. Finally, under 18 U.S.C. § 1965, each Defendant is subject to this Court's personal jurisdiction because each Defendant "resides," may be "found," and/or "transacts his affairs" within this judicial District. As such, this Court's exercise of personal jurisdiction over each Defendant is proper and does not offend traditional notions of fair play and substantial justice.

14.    This Court has subject matter jurisdiction over this action. Under 28 U.S.C. §1331, this Court has original subject matter jurisdiction because this action arises under one or more federal laws and statutes. And, under 28 U.S.C. §1367, this Court has supplemental jurisdiction over Plaintiffs' state law claims because those claims arise from and form part of the same case or controversy as Plaintiffs' federal claims and causes of actions. Additionally, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2) because the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, and this is a putative class action in which the citizenship of at least one Class Member is different than that of Defendants.

15.    Venue is proper in this District. Under 28 U.S.C. §1391(b), venue is proper in this Court because: (1) each Defendant "resides" in this judicial District; and (2) "a substantial part of the events or omissions" giving rise to Plaintiffs' claims occurred in this judicial District. Venue also is proper in this District pursuant to 18 U.S.C. §1965(a), which provides that "[a]ny civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs," because each Defendant "resides," may be "found," and "transacts his affairs" in and from this judicial District.

## FACTUAL BACKGROUND

16.    The allegations set forth above are re-alleged and incorporated herein.

17.    Defendants created and executed a fraudulent scheme to convince individuals, including Plaintiffs and the Class, to deposit millions of dollars into a supposedly safe and secure electronic currency "vault," or platform. By Defendants' design, those funds were deposited into that vault via a "smart contract" and a website, which contained a user interface to interact with and use such vault and smart contract, that were coded, implemented, operated and controlled by Defendants. Defendants created and used numerous fake and fictitious internet identities to convey a false impression that their electronic vault (or platform or protocol) was safe and secure. However, contrary to Defendants' knowingly false representations, Plaintiffs' and the Class' deposits of millions of dollars into Defendants' vault were ***not*** safe or secure, as the underlying deposited collateral was vulnerable to being misappropriated. But, as a result of their reasonable reliance on Defendants' misrepresentations, Plaintiffs and the Class deposited—and subsequently lost and were deprived of—millions of dollars due to Defendants' fraudulent and illegal scheme.

18.    Defendants designed, developed, promoted and used a variety of cryptocurrency products, platforms and protocols to perpetrate and execute their fraudulent scheme alleged herein.

19.    The first instrumentality Defendants used to execute their fraudulent scheme was a cryptocurrency trading platform, called "Saber," built on the Solana blockchain. Unlike their other instrumentalities, Defendants openly acknowledged they founded and developed Saber as a platform for trading between "stablecoins," a type of cryptocurrency tokens that are designed to remain stable in price because they purportedly are "pegged" to the value of a fiat currency, such as the U.S. Dollar or the Euro. Defendants officially launched Saber in or around June 2021.

20.    Saber facilitated trades of stablecoins through the use of "liquidity pools" for each trading pair—*i.e.*, a platform designed to hold quantities of two different assets or tokens, so that

users of the platform could trade between those assets by depositing one and withdrawing the other.

21.    Saber incentivized users to deposit various U.S. Dollar-pegged stablecoins into Saber liquidity pools, including Tether ("USDT"), USD Coin ("USDC"), and Cashio (as described in more detail below, "CASH").

22.    In exchange for (and to incentivize) such deposits, Saber users would receive liquidity pool tokens ("LP tokens") that purportedly would both: (a) serve as a "receipt" for the user's deposit (*e.g.*, if a user deposited USDC into the USDT-USDC liquidity pool, they would receive USDT-USDC LP tokens in return); and (b) entitle the user to a share of the Saber platform trading fees from the applicable stablecoin trading pair.

23.    When users were ready to withdraw their deposit, they purportedly could exchange their LP tokens for the underlying asset(s) in the applicable liquidity pool (*e.g.*, a holder of USDT-USDC LP tokens could exchange those LP tokens for USDC, USDT, or a combination of both, regardless of which asset(s) they originally deposited into the USDC-USDT liquidity pool).

24.    Ultimately, Defendants built twelve separate projects on the Solana blockchain to inflate the value of their cryptocurrency ecosystem, including Saber and its native token, SBR. Defendants made it appear publicly that eleven of the twelve (all except Saber) were developed independently from Defendants. Defendants' ecosystem projects and aliases were as follows:

| Project | About | Publicly Claimed Developer |
|---|---|---|
| Saber | Automated market maker platform for stablecoins | Ian and Dylan Macalinao |
| Sunny Aggregator | A liquidity aggregator | Surya Khosla |
| Cashio | Centralized fee stablecoin, was attacked in March 2022 with more than $52 million in damage, CASH price then fell to ~$0.00 | 0xGhostchain |
| Goki | multi-sig wallet | Goki Rajesh |
| Quarry | mining reward aggregator platform | Larry Jarry |

| TribecaDAO | decentralized governance platform | Swaglioni |
| Crate | tokenize assets | Kiwipepper |
| aSOL | SOL key token | 0xAurelion |
| Arrow | yield farming | Oliver_Code |
| Traction market | futures options platform | 0xIsaacNewton |
| Sencha | Decentralized cryptocurrency exchange | JJmatcha |
| Venko | payment application | Ayyakovenko |

25.     Defendants used aliases and presented these projects as independently developed for a simple, fraudulent purpose—to create the impression that multiple developers were actively involved in and developing various tools and functionalities on the Saber platform. This in turn demonstrated support and endorsement by multiple internet operators and individuals in the platform, which enabled Defendants to successfully inflate the apparent value of the Saber platform, the SBR token, and each of these projects.

26.     The Cashio project was at the forefront of this deception and ultimately proved to be the Achilles heel of Defendants' illegal operation.

27.     Cashio was the second instrumentality Defendants created and used to execute their scheme and perpetrate their fraud. Cashio was a cryptocurrency platform or protocol with a U.S. Dollar-pegged stablecoin token, called "CASH," that was launched in November 2021.

28.     Cashio invited and offered users the opportunity to "mint" (*i.e.*, create and receive) CASH by depositing Saber USDT-USDC LP tokens and, conversely, to "burn" CASH to withdraw underlying LP tokens. The LP tokens held as collateral were advertised as generating SUNNY/SBR yield for the Cashio treasury via a separate protocol named "Quarry."

29.     When users were ready to withdraw the value of their investment, the Cashio protocol purportedly would allow users to exchange their CASH tokens for the underlying USDT-USDC LP tokens, which users could then exchange for the underlying USDT and/or USDC.

30.    It was represented to Plaintiffs and the Class that Cashio held these LP tokens as collateral and further that some of the value of the invested currency was being lent out, thereby allowing investors to receive interest for their investment in Cashio.

31.    Because Defendants concealed their identity and operated Cashio under various pseudonyms, such as "0xGhostchain," it allowed Defendants to create a false impression of active involvement, support and endorsement by multiple internet operators and individuals in the Cashio platform. It also allowed Defendants to publicly tout the safety and security of the "independently" developed Cashio, lending an apparently independent voice of support, safety and security.

32.    In doing so, Defendants knowingly and expressly made numerous false and fraudulent statements regarding both the operation and security of Cashio to induce Plaintiffs and the Class into depositing assets in the Cashio platform.

33.    For example, on November 23, 2021 and other dates around this time, Ian Macalinao promoted the safety and security of Cashio by stating: "I personally audited the Cashio code, and I'm working with the team to get the source verified."

34.    For another example, on November 26, 2021 and other dates around this time, Ian Macalinao touted the safety and security of depositing assets in Cashio by stating: "all Cashio dollar deposits are fully backed by interest-bearing stable pair LP tokens."

35.    Similarly, the Cashio website—designed, controlled and operated by Defendants at all relevant times—advertised the purported security of the protocol in similar manners by claiming that "all [CASH] deposits are fully backed by interest-bearing [Saber LP tokens]."

36.    Defendants also manipulated the "yield" on Saber CASH-USDC LP tokens to induce the Plaintiffs to invest in Cashio by providing USDC to the Saber CASH-USDC liquidity pool.

37. Each of these repeated statements, and others like them made by Defendants, were material to investors, including Plaintiffs and the Class, because they conveyed the false impression that investing in Cashio—*i.e.*, depositing funds into the Cashio vault—was safe, secure and reasonably likely to lead to lawful profits.

38. Plaintiffs and the Class relied on these statements and representations and trusted Defendants to be honest and truthful.

39. In reliance on Defendants' representations, Plaintiffs and the Class invested millions of dollars into Cashio by providing USDC to the Saber CASH-USDC liquidity pool.

40. On March 23, 2022, the Cashio platform was hacked. Contrary to Defendants' representations about Cashio's safe and secure protocol, the Cashio vault was hacked by an exploitation of an "infinite mint" vulnerability in the unsecure protocol.

41. Specifically, this vulnerability existed in Cashio's supposedly audited code. The vulnerability allowed the hacker to create an infinite number of CASH tokens, without depositing any Saber USDT-USDC LP tokens.

42. The hacker then used its newly minted CASH tokens to withdraw over $50 million of the USDC and USDT collateral that investors, including Plaintiffs and the Class, deposited via the Cashio protocol and various Saber CASH liquidity pools.

43. This led the value of the CASH token to plunge from a value of $1.00 to less than one percent of one U.S. cent and, ultimately, be delisted from all exchanges.

44. As a result of the "infinite mint" hack, holders of Saber CASH-[stablecoin] LP tokens, including Plaintiffs and the Class, were able to withdraw only CASH tokens from Saber liquidity pools, and holders of CASH, including Plaintiffs and the Class, were prevented from obtaining USDT-USDC LP tokens in exchange for the CASH tokens that they still held. Thus,

their CASH tokens were rendered worthless, and Plaintiffs and the Class completely lost the value of their deposits/investments.

45.    Only months after the Cashio hack was it revealed that the eleven "independent" developers set forth in paragraph 24, *supra*, were not remotely independent. For the first time, Plaintiffs and the Class were made aware that these actually were aliases of Defendants.

46.    Moreover, Defendants' statements, representations and conduct described above was shown to be demonstrably false, fraudulent and part of a coordinated pattern of unlawful racketeering activity.

47.    Indeed, the hack itself demonstrated that Cashio was not a secure protocol, was not properly audited, and did not safely hold the collateral LP tokens that had been deposited by CASH holders.

**The Truth About Defendants' Fraudulent Scheme Subsequently Emerged**

48.    After the hack, Defendants' subsequent actions and admissions demonstrate their undoubtable liability for Plaintiffs' losses.

49.    On August 4, 2022, Coindesk.com published an article that exposed Defendants' deception.[1] The Coindesk Article describes how Defendant Ian Macalinao pretended to be "11 purportedly independent developers[.]"

50.    The article explained that Defendant Ian Macalinao did this to "create[] a vast web of interlocking DeFi protocols that projected billions of dollars of double-counted value onto the Saber ecosystem."

---

[1] *See* COINDESK, *Master of Anons: How a Crypto Developer Faked a DeFi Ecosystem* (Aug. 4, 2022), https://www.coindesk.com/layer2/2022/08/04/master-of-anons-how-a-crypto-developer-faked-a-defi-ecosystem/ (hereinafter, the "Coindesk Article").

51.     The Coindesk Article also described how its authors gained access to an unpublished blog post that Ian Macalinao wrote "on March 26, three days after Cashio, one of Ian's secretly built protocols, lost $52 million in a hack."

52.     This blog post contains countless shocking admissions of guilt and liability by Defendant Ian Macalinao.

53.     First, Defendant Ian Macalinao admitted in his blog post that he defrauded investors by intentionally "build[ing] protocols that stack on top of each other, such that a dollar could be counted several times," thereby artificially inflating the apparent value of Defendants' platforms.

54.     Likewise, Ian Macalinao admitted that the code Defendants designed and touted for Cashio and their other projects was "insecure."

55.     Ian Macalinao also admitted that, contrary to his representations otherwise, neither he nor anyone else legitimately audited the Cashio code.

56.     Rather, Ian Macalinao stated: (1) "I did not audit Cashio as closely as I should have;" and (2) "I didn't get anyone else to look at the code, including an auditor. I should not have done this."

57.     Indeed, not only did Defendants fail to properly audit their own code, but they also failed to have a third-party conduct an audit—a common and expected process in the DeFi space.

58.     In the blog, Ian Macalinao also admitted that he "should have brought in a team of auditors to look at it . . ."

59.     If Cashio was audited as the Defendants represented it had been, the vulnerability[2] that led to the hack would have been discovered and the hack would have been prevented.

---

[2] The existence of this vulnerability further demonstrates that Cashio was not secure.

60.     Finally, the hack would not have resulted in the ultimate collapse of the Cashio protocol if Cashio had actually safely held Plaintiffs' and the Class' deposited LP Tokens.

61.     As both representatives and developers of Cashio, Defendants knew or should have known that Cashio's code contained acute, obvious vulnerabilities—vulnerabilities that directly caused the Plaintiffs and the Class damage.

62.     Defendants owed a duty to avoid or immediately remediate these vulnerabilities by updating the code but failed to do so.

63.     Furthermore, when Defendants were soliciting investments into Cashio, Defendants hid their identities as the true developers of Cashio and as the identities behind at least ten other developer/founder aliases working on various interconnected Solana DeFi protocols.

64.     Plaintiffs' losses due to the collapse of Cashio were the result of Defendants' wider intentional scheme to mislead investors by promising yields using deceptive accounting of total value locked into the advertised ecosystem.

65.     Indeed, Ian Macalinao admitted his liability when he wrote "that if the hacker didn't pay users back in full 'I will do what I can to repay affected personal users in my personal Saber and Sunny tokens. This won't cover the full amount, but it's all I have to offer.'"

66.     Neither Defendant has made good on this promise. Rather, Defendants have ignored the Plaintiffs' attempts at communicating with them, much less their demands for payment.

67.     Unsurprisingly, it has now been reported that Defendants are under investigation by the U.S. Department of Justice for their fraudulent actions.[3]

---

[3] *See* CoinDesk, DOJ Said to Probe Saber Labs Founders Over Solana-Based DeFi Stablecoin Projects (Jan. 11, 2023) https://www.coindesk.com/business/2023/01/11/doj-said-to-probe-saber-labs-founders-over-solana-based-defi-stablecoin-projects/.

## CLASS ACTION ALLEGATIONS

68.     The allegations set forth above are re-alleged and incorporated herein.

69.     Plaintiffs bring this suit as the representatives of a class pursuant to Federal Rule of Civil Procedure 23(b)(3). The "Class" is comprised of and defined as follows:

> All United States residents who purchased CASH tokens by depositing funds into the Cashio protocol prior to March 23, 2022. Excluded from the Class are Defendants and their immediate family members.

70.     The Class is so numerous that joinder of all members is impracticable. On information and belief, the Class is comprised of hundreds—if not thousands—of members.

71.     Plaintiffs' claims are typical of the claims of Class. Plaintiffs, like all members of the Class, are United States residents who purchased CASH tokens by depositing funds into the Cashio protocol prior to March 23, 2022.

72.     Moreover, like each Class member, Plaintiffs: (a) were induced by Defendants' misleading representations and fraudulent course of conduct to deposit their funds into the Cashio vault; (b) made such deposits based on the false impression, knowingly created by Defendants through the execution of their fraudulent scheme, that such deposits were safe and secure; (c) were unsuspectingly victimized by Defendants' scheme when the truth—that the Cashio platform and protocol was not safe or secure and was never independently audited—was revealed and Plaintiffs' investments were stolen and/or rendered worthless through the Cashio hack; and (d) suffered financial harm as a result of Defendants' fraudulent scheme, which constitutes a pattern of racketeering activity under federal law.

73.     Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs' interests do not conflict with the interests of the Class. Plaintiffs are represented by skilled counsel with experience in complex civil litigation matters, including class actions.

74.     The averments of fact and questions of law herein are common to the Class, and such common questions of fact and law predominate over any questions affecting only individual Class members. Among others, common questions of law and/or fact include:

a.      Whether Defendants operated a fraudulent and unlawful scheme;

b.      Whether Defendants made materially false or misleading representations concerning investments in Cashio, the CASH token, and/or the safety and security of the Cashio platform or protocol;

c.      Whether Defendants acted knowingly, recklessly and/or with an otherwise culpable mental state;

d.      Whether Defendants' actions or course of conduct caused financial or other harm to members of the Class;

e.      Whether Defendants' coordinated pattern of activity violates the federal Racketeering Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§1961, *et seq*.;

f.      Whether Defendants engaged in a conspiracy to violate the federal RICO Act, 18 U.S.C. §§1961, *et seq*.;

g.      Whether Defendants engaged in at least two (2) acts of mail and/or wire fraud when operating their Cashio scheme;

h.      Whether the Class is entitled to a common-sense inference or presumption of reliance and/or transaction causation under the federal RICO Act, 18 U.S.C. §§1961, *et seq.*, and Fifth Circuit jurisprudence;

i.      Whether Defendants violated, or conspired to violate, the Computer Fraud and Abuse Act, 18 U.S.C. §§1030, *et seq.*, through their Cashio scheme;

j.      Whether Texas law applied to the conduct of Defendants, who are and were at all relevant times residents of the State of Texas;

k.      Whether Defendants violated Texas law, including the Texas Deceptive Trade Practices Act, TEX. BUS. & COM. CODE §§ 17.41, *et seq.*, and Texas common law with respect to the state law claims and causes of action alleged herein, and if so, whether Defendants did so knowingly, intentionally and/or with actual malice;

l.    Whether the Class sustained damages as a result of Defendants' conduct and, if so, the proper measure of damages and/or the proper remedies available to the Class; and

m.    Whether the Class is entitled to punitive damages, trebled damages under their statutory causes of actions, attorneys' fees and/or costs of suit.

75.    Class action treatment is superior to any other method of proceeding and for the fair and efficient adjudication of this controversy because class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. Moreover, a class action is superior to any other available means or method for fairly and efficiently adjudicating this controversy because:

a.    The questions of law and fact are so uniform across the Class that there is no reason why individual Class members would want to control the prosecution of their own actions at their own expense;

b.    To Plaintiffs' knowledge, there is no pending litigation against Defendants that incorporates the claims and causes of action or overall controversy alleged and asserted herein;

c.    The interests of all parties and the judiciary in resolving these matters in one forum without the need for a multiplicity of actions are great;

d.    Defendants are and were at all relevant times residents of this judicial District;

e.    Defendants have acted on grounds that apply equally and generally to the Class, such that a single action against Defendants is appropriate; and

f.    The difficulties in managing this class action will be slight in relation to the potential benefits to be achieved on behalf of each and every Class member, and not just those who can afford to bring their own individual actions.

## CAUSES OF ACTION AND CLAIMS FOR RELIEF

### COUNT ONE:  VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO) ACT (18 U.S.C. §§ 1961, ET SEQ.)

76.    The allegations set forth above are re-alleged and incorporated herein.

77.     Defendants' fraudulent scheme and conduct alleged herein violated the federal Racketeer Influenced and Corrupt Organization ("RICO") Act, 18 U.S.C. §§1961, *et seq*.

78.     Section 1962(b)-(d) of the RICO Act provide that it "shall be unlawful" for:

a.     "any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce;"

b.     "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt;" and

c.     "any person to conspire to violate any of the provisions" above.

79.     Each Defendant is and was at all relevant times a RICO "person" because each Defendant is and was an individual capable of holding a legal or beneficial interest in property.

80.     From at least June 2021 and continuously thereafter, the RICO "enterprise" was an association in fact consisting of at least Defendant Ian Macalinao, Defendant Dylan Macalinao, numerous fake internet identities fictitiously created and used by Defendants, sham entities or associations created and used by Defendants, and potentially other currently unknown co-conspirators and association-in-fact members.

81.     Defendants, along with their co-conspirators, associated together for a common purpose of engaging in a course of racketeering activity (within the meaning of 18 U.S.C. §1961(1)) and, therefore, collectively constituted a RICO "enterprise"—*i.e.*, a group of individuals or entities associated in fact for the purpose of engaging in the operation of a fraudulent scheme to unlawfully obtain millions of dollars from their victims, such as the Class.

82.     In essence, the purpose of this association-in-fact enterprise was to fraudulently induce deposits of funds into the Cashio platform/protocol based on Defendants' repeated and false

promises that such deposits into the Cashio vault were safe, secure, fully backed by sufficient and legitimate collateral safely maintained in the vault, and likely to lead to profit through the generation of interest. Not only was the purpose of this enterprise unlawful, but Defendants used a myriad of unlawful acts of mail and wire fraud to accomplish the enterprise's goal.

83.    Specifically, Defendants have engaged in a pattern of racketeering activity, including at least multiple acts of wire fraud and mail fraud, among other predicate acts and crimes.

84.    Defendants repeatedly made and used false promises and fraudulent misrepresentations concerning the safety and security of the Cashio protocol, including through Defendants' repeated misleading creation and use of fake identities and fictitious individuals, to promote and induce others, including Plaintiffs and the Class, to deposit their funds into the supposedly safe and secure vault that the Cashio platform provided. In addition to using the internet to disseminate these false statements and fraudulent promotions, Defendants used the wires and the mails to advertise, advance, conceal and further their scheme to defraud.

85.    Defendants committed all of their acts of racketeering activity within the past ten (10) years, as required by the RICO Act, 18 U.S.C. §1961(5). And all of Defendants' racketeering activities had the same or similar results, participants, victims and methods, or otherwise were interrelated by distinguishing characteristics and were not isolated incidents.

86.    Defendants' RICO enterprise had a continuing, on-going structure and functioned as a continuous unit with established duties separate and apart from the pattern of racketeering activity alleged herein.

87.    Defendants agreed to engage in a RICO conspiracy, and each Defendant participated in the operation of the enterprise by performing a role that was essential to its operation and continued success and committing repeated, overt acts to accomplish Defendants' goal.

88.    Defendants racketeering activities affected interstate commerce.

89.    Each Plaintiff and Class Member suffered an injury to their property and/or business that was proximately caused by and occurred "by reason of" Defendants' unlawful acts, fraudulent misrepresentations, and overall pattern of racketeering activity.

90.    Defendants' intentional and unlawful violations of the RICO Act proximately caused Plaintiffs and the Class to suffer monetary damages.

91.    For their RICO claim, Plaintiffs and the Class seek actual damages, treble damages, costs of suit and reasonable attorneys' fees, as provided for by 18 U.S.C. §1964(c), as well as any and all other further or additional relief the Court may award.

### COUNT TWO:  VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. §§ 1030, *ET SEQ.*)

92.    The allegations set forth above are re-alleged and incorporated herein.

93.    Defendants' conduct alleged herein violated the federal Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. §§1030, *et seq.*

94.    The CFAA broadly prohibits unauthorized access to computers connected to the internet. In particular, the CFAA imposes criminal and civil liabilities and penalties on anyone who intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains information from any protected computer, or who conspires or attempts to do so.

95.    The CFAA is further violated by anyone who: knowingly causes the transmission of a program, information, code or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer; and/or knowingly and with intent to defraud, traffics in any password or similar information through which a computer may be accessed with authorization if such trafficking affects interstate or foreign commerce.

96.    Defendants knowingly and intentionally allowed the Cashio protocol to be accessed by an unauthorized hacker by failing to reasonably audit or ensure the security and safety of the Cashio protocol, as Defendants falsely represented they had done.

97.    Specifically, Defendants knowingly, intentionally and/or recklessly left the "back door" to the Cashio computer system and protocol open to a hack, and the Cashio hacker easily walked through that coding "back door" to unlawfully steal and/or misappropriate over $50 million that belonged to the Class.

98.    Upon information and belief, Defendants conspired with said hacker to allow the hacker to obtain unauthorized access to the Cashio protocol and computer system, as well as Plaintiffs' and the Class' funds deposited in said protocol and computer system.

99.    Plaintiffs and the Class were actually damaged by Defendants' violations of, and Defendants' conspiracy to violate, the CFAA. As a result, Plaintiffs and the Class seek all available remedies under federal law for violations of the CFAA.

### COUNT THREE:    COMMON-LAW FRAUD AND MISREPRESENTATION

100.    The allegations set forth above are re-alleged and incorporated herein.

101.    Defendants actions and course of conduct alleged herein constitutes fraud and misrepresentation under Texas common law.

102.    As residents of Texas at the time of their actionable conduct, Defendants knew that Texas law applied to their activities. However, Defendants knowingly, intentionally and/or recklessly disregarded the obligations Texas law imposed upon them.

103.    Defendants repeatedly made numerous, uniform misrepresentations and/or omissions of material fact to Plaintiffs and the Class concerning the safety and security of the Cashio platform or protocol, the CASH token and investments in Cashio or CASH. Such

misrepresentations were false, misleading, material and fraudulent, and Defendants knew it. That is, Defendants knowingly made these repeated and uniform misrepresentations and omissions to fraudulently induce Plaintiffs and the Class into depositing their funds into the Cashio system.

104.     Non-exhaustive examples of such uniform, material misrepresentations by Defendants include, but are not limited to:

        a.    Defendant Ian Macalinao's November 26, 2021 false and misleading representation (disseminated using the internet or wires) that "all Cashio dollar deposits are fully backed by interest-bearing stable pair LP tokens;"

        b.    Defendants Ian and Dylan Macalinao's repeated dissemination, at or around the same time period and over the wires and the internet, of the above misrepresentation on Cashio's website; and

        c.    Defendant Ian Macalinao's November 23, 2021 false and misleading representation over the wires and on the internet that he had "personally audited" Cashio's code.

105.     As Defendant Ian Macalinao later secretly admitted, these representations were knowingly false and misleading. These representations were false and misleading because: (a) neither Macalinao nor any independent third party legitimately audited the Cashio code; and (b) deposits into the Cashio platform were not safely backed by securely held collateral. As such, when Defendants made these misrepresentations, they were knowingly and/or recklessly false and misleading.

106.     Defendants made and sent their false and misleading representations to Plaintiffs and the Class with the specific intent that Plaintiffs and the Class rely on Defendants' fraudulent statements. Defendants knew that Plaintiffs and the Class had no other choice but to rely on Defendants' fraudulent representations. And Plaintiffs and the Class did, in fact, rely on these uniform misrepresentations and/or omissions as being truthful and accurate. Indeed, by depositing funds into the Cashio platform, Plaintiffs and the Class exhibited their belief in and reliance upon

the truth of Defendants' misrepresentations that such deposits were safe, secure and audited. Under these circumstances, reliance of the Class may be presumed and inferred in law and in fact.

107.    Plaintiffs and the Class were damaged by their reasonable and justifiable reliance on Defendants' misrepresentations. Specifically, Plaintiffs and the Class were damaged by such reliance because the funds they deposited in the Cashio platform—based on the false impression that such investments were safe, secure and audited—were taken from Plaintiffs and the Class and never returned or fully reimbursed.

108.    Defendants' fraudulent actions and statements were made and taken intentionally, knowingly, with actual malice, and with utter disregard to the rights of Plaintiffs and the Class.

109.    As such, in addition to actual damages, Plaintiffs seek an award of punitive damages under Texas law against Defendants to punish Defendants and set an example for others.

COUNT FOUR:          COMMON-LAW NEGLIGENT MISREPRESENTATION

110.    The allegations set forth above are re-alleged and incorporated herein.

111.    Defendants actions and course of conduct alleged herein constitutes negligent misrepresentation under Texas common law.

112.    As residents of Texas at the time of their actionable conduct, Defendants knew that Texas law applied to their activities. However, Defendants knowingly, intentionally and/or recklessly disregarded the obligations Texas law imposed upon them.

113.    Throughout 2021 and thereafter up until the time of the March 2022 hack, Defendants repeatedly provided numerous representations to Plaintiffs and the Class concerning the safety and security of depositing or investing funds into the Cashio platform.

114.    Specifically, as set forth above, Defendants repeatedly reassured Plaintiffs and the Class that Cashio's code had been audited and that all Cashio deposits were safely and securely backed by interest-bearing stable pair LP tokens, when neither statement was true.

115.    These misrepresentations were made to provide guidance to Plaintiffs and the Class and fraudulently convince Plaintiffs and the Class to deposit funds into the Cashio system because such funds would be safe, secure, and likely to generate a profit through interest.

116.    However, these representations were false and misleading.

117.    Defendants did not exercise reasonable care or competence in communicating information concerning the safety or security of funds deposited in the Cashio system to Plaintiffs and the Class.

118.    Plaintiffs and the Class relied upon Defendants' misrepresentations in deciding to deposit their funds and personal savings into the Cashio system. However, based on these misrepresentations, Plaintiffs and the Class lost and were deprived of their deposits.

119.    As a direct and proximate result of their reliance on Defendants' misrepresentations, Plaintiffs and the Class have been harmed and damaged.

### COUNT FIVE:  VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT (TEX. BUS. & COM. CODE §§17.41, *ET SEQ.*)

120.    The allegations set forth above are re-alleged and incorporated herein.

121.    Defendants actions and course of conduct alleged herein violated the Texas Deceptive Trade Practices Act ("DTPA"), TEX. BUS. & COM. CODE §§17.41, *et seq.*

122.    As residents of Texas at the time of their actionable conduct, Defendants knew that Texas law applied to their activities. However, Defendants knowingly, intentionally and/or recklessly disregarded the obligations Texas law imposed upon them.

123.    Under the DTPA, Plaintiffs and the Class were, are and constitute "consumers" because they were individuals, partnerships or corporations who sought or acquired goods or services by purchase.

124.    Among other ways, Defendants' conduct violated the DTPA because Defendants engaged in at least the following false, misleading or deceptive acts or practices that are prohibited by the DTPA:

    a.    causing confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another;

    b.    representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not;

    c.    representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

    d.    failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

125.    As demonstrated above, Plaintiffs and the Class were harmed by Defendants' deceptive acts and practices, which were a producing cause of economic damages and damages for mental anguish suffered by Plaintiffs and the Class.

126.    Furthermore, the DTPA provides that consumers may maintain an action for economic damages and mental anguish damages for "any unconscionable action or course of action by any person." The term "unconscionable action" is defined as "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." *See* TEX. BUS. & COM. CODE § 17.45.

127.    Notably, the DTPA is to be "liberally construed and applied to promote its underlying purposes, which are to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection." *See id.* § 17.44.

128.    Here, Defendants' fraudulent scheme to mislead Plaintiffs and the Class concerning the safety and security of deposits into the Cashio platform constitutes an "unconscionable action or course of action" under the DTPA because Defendants' actions were to Plaintiffs' and the Class' detriment, and took advantage of Defendants' exclusive access to information demonstrating their statements and conduct were false and fraudulent, while exploiting Plaintiffs' and the Class' lack of knowledge, ability, experience or capacity, to a grossly unfair degree.

129.    Defendants' conduct was a producing cause of actual damages incurred by Plaintiffs and the Class, for which Plaintiffs bring this suit. The actual damages incurred by Plaintiffs and the Class include, among other things, the reasonable and necessary cost to restore Plaintiffs' personal deposits and investments which were lost.

130.    Plaintiffs and the Class justifiably relied on Defendants' deceptive acts or practices to Plaintiffs' and the Class' detriment, in that Plaintiffs and the Class deposited and invested their personal savings in Cashio in reliance upon the truth, accuracy and completeness of Defendants' above-described statements.

131.    Defendants' above-described, unlawful conduct was committed knowingly and intentionally. Defendants were aware that their statements were false. Therefore, in addition to actual damages, Plaintiffs seek to recover under the DTPA for and on behalf of the Class for mental anguish damages, up to three times the amount of their actual damages, reasonable attorneys' fees, costs and expenses of suit, and all other and further available relief.

## COUNT SIX:    COMMON-LAW NEGLIGENCE

132.    The allegations above are re-alleged and incorporated herein.

133.    Defendants actions and course of conduct alleged herein constitutes negligence under Texas common law.

134.    As residents of Texas at the time of their actionable conduct, Defendants knew that Texas law applied to their activities. However, Defendants knowingly, intentionally and/or recklessly disregarded the obligations Texas law imposed upon them.

135.    Defendants owed Plaintiffs and the Class a duty to exercise ordinary and reasonable care in Defendants' dealings with Plaintiffs.

136.    Defendants breached the duty they owed to Plaintiffs and the Class, including by: (a) failing to reasonably secure funds deposited into the Cashio protocol; (b) unreasonably allowing funds deposited in the Cashio protocol to be hacked through code vulnerabilities that Defendants knew about or recklessly disregarded; and (c) making misrepresentations about the safety and security of the Cashio system to Plaintiffs and the Class that were false, misleading and lacked any reasonable basis in fact or reality.

137.    Defendants' breaches proximately caused Plaintiffs and the Class to suffer financial losses, mental anguish and other damages.

## COUNT SEVEN:        GROSS NEGLIGENCE

138.    The allegations above are re-alleged and incorporated herein.

139.    Defendants actions and course of conduct alleged herein constitutes gross negligence under Texas common law.

140.    As residents of Texas at the time of their actionable conduct, Defendants knew that Texas law applied to their activities. However, Defendants knowingly, intentionally and/or recklessly disregarded the obligations Texas law imposed upon them.

141.    Defendants owed Plaintiffs and the Class a duty to exercise ordinary and reasonable care in Defendants' dealings with Plaintiffs.

142.    Defendants breached the duty they owed to Plaintiffs and the Class, including by: (a) failing to reasonably secure funds deposited into the Cashio protocol; (b) unreasonably allowing funds deposited in the Cashio protocol to be hacked through code vulnerabilities that Defendants knew about or recklessly disregarded; and (c) making misrepresentations about the safety and security of the Cashio platform to Plaintiffs and the Class that were false, misleading and lacked any reasonable basis in fact or reality.

143.    Defendants' breaches proximately caused Plaintiffs and the Class to suffer financial losses, mental anguish and other damages.

144.    Defendants committed these breaches knowingly, intentionally, with actual malice and/or with reckless disregard for the rights of Plaintiffs and the Class.

145.    As a result, in addition to an award of actual damages to Plaintiffs and the Class, Plaintiffs seek an award of punitive damages against Defendants under Texas law for Defendants' reckless and malicious conduct towards Plaintiffs and the Class.

### COUNT EIGHT:    CIVIL CONSPIRACY

146.    The allegations set forth above are re-alleged and incorporated herein.

147.    Each Defendant conspired, colluded and combined with the other to commit the tortious acts and perpetrate the unlawful scheme alleged herein. As such, each Defendant is jointly

and severally liable for the acts and omissions of all of their co-conspirators in furtherance of the conspiracy and for the full harm that this conspiracy inflicted on Plaintiffs and the Class.

148.    By conspiring with one another, Defendants formed and became members of a combination of two or more persons.

149.    The object of Defendants' combination was to accomplish an unlawful purpose or a lawful purpose by unlawful means. The unlawful purpose of Defendants' conspiracy and the unlawful means Defendants used to accomplish their plan included each of the causes of action set forth above (except for ordinary negligence).

150.    Defendants agreed and had a meeting of the minds on the object of their conspiracy and/or the course of action to accomplish their unlawful purpose.

151.    At least one member of the conspiracy—Defendant, Ian Macalinao or Defendant, Dylan Macalinao—committed an unlawful, overt act to further the object or course of action. Examples of such unlawful, overt acts include, but are not limited to: (a) the false and fraudulent representations that "I personally audited the Cashio code," made by Defendant, Ian Macalinao; and (b) Defendants' fraudulent creation and use of pseudonyms to falsely and fraudulently prop up the stability and security of Cashio in order to induce Plaintiffs to invest their savings in Cashio.

152.    Plaintiffs and the Class suffered injury as a proximate result of Defendants' wrongful acts, omissions and conspiracies.

## NOTICE AND CONDITIONS PRECEDENT

153.    The allegations set forth above are re-alleged and incorporated herein.

154.    All conditions precedent to Plaintiffs' recovery under the causes of action set forth below and herein have been performed and/or have occurred.

155.    In particular, with respect to Plaintiffs' DTPA claims alleged above, written notice advising Defendants in reasonable detail of Plaintiffs' DTPA claims, the amount of economic damages Plaintiffs suffered and seek as a result of Defendants' conduct, and the fact that Plaintiffs will seek damages for mental anguish, was sent by FedEx Priority mail to Defendants at their residence. Defendants signed for and, thus, received this statutory notice on April 3, 2023. Payment was not tendered to Plaintiffs and has not been so tendered since Plaintiffs' statutory notice letter was received by Defendants.

156.    Moreover, Plaintiffs have timely filed this action on behalf of the Class, and Plaintiffs acted reasonably, diligently and timely in filing this action on behalf of the Class once the facts necessary to do so were and could be reasonably discovered by Plaintiffs and their counsel. To the extent any statute of limitations or repose is pled by Defendants as an affirmative defense, Plaintiffs affirmatively plead that fraud, fraudulent concealment, and other equitable tolling doctrines apply to toll Plaintiffs' and the Class' claims.

### JURY DEMAND

157.    Plaintiffs demand a trial by jury on all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, premises considered, Plaintiffs seek and pray for the following relief:

158.    An order certifying the Class, allowing this case to proceed as a class action and appointing Plaintiffs as the class representatives and the undersigned as class counsel, according to Federal Rule of Civil Procedure 23(b)(3);

159.    An order and judgment requiring Defendants to pay Plaintiffs and Class members actual damages in an amount to be determined at trial that fully compensates them for losses and

harms sustained as a result of Defendants' violations of the law, breaches of their obligations, and other unlawful conduct alleged herein;

160.    An order and judgment awarding Plaintiffs and the Class treble damages for Defendants' violations of the federal RICO Act and Texas DTPA;

161.    An order and judgment awarding Plaintiffs and the Class punitive or exemplary damages in an amount to be determined at trial for Defendants' intentional, knowing, malicious and reckless conduct alleged herein;

162.    An order and judgment awarding Plaintiffs and Class members reasonable attorneys' fees, costs and expenses of this lawsuit, pre-judgment and post-judgment interest to the extent allowed by law, and any and all equitable or restitutionary relief to which Plaintiffs and the Class may be entitled or as may be determined by the Court; and

163.    Such other costs and further relief as this Court deems appropriate.


Dated: March 22, 2024

<div style="margin-left:40%">

Respectfully submitted,

*/s/ J. Travis Underwood*
J. Travis Underwood
State Bar No. 24102587
**GILLAM & SMITH LLP**
303 South Washington Avenue
Marshall, Texas 75670
Telephone: (903) 934-8450
Fax: (903) 934-9257
travis@gillamsmithlaw.com


*/s/ Cody L. Hill*
Cody L. Hill, TX Bar No. 24095836
Jeffrey J. Angelovich, TX Bar No. 00786988
**NIX PATTERSON, LLP**
8701 Bee Cave Road, Suite 500

</div>

Austin, TX 78746
Telephone: (512) 328-5333
Fax: (512) 328-5335
jangelovich@nixlaw.com
codyhill@nixlaw.com

**ATTORNEYS FOR PLAINTIFFS AND THE PUTATIVE CLASS**